UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PETER J. LONG,

        Plaintiff,

        v.                                 Case No. 21-C-1210

JOHN F. MATZ, TODD D. CHRISTIE,
MICHAEL J. LICHTENSTEIGER,
AMBER T. ROZEK, JASON H. DURRANT,
TRAVIS R. VIERGUTZ, JOHN DOE,
and JANE DOE,

        Defendants.

# SCREENING ORDER

Plaintiff Peter Long, who is currently serving a state prison sentence at Kettle Moraine Correctional Institution and representing himself, filed a civil rights complaint under 42 U.S.C. §1983 alleging that Defendants violated his civil rights while he was incarcerated at the Winnebago County Jail. Dkt. No. 1. On December 20, 2021, the Court screened Long's complaint and concluded it failed to provide enough detail to determine whether Long stated viable constitutional claims. Dkt. No. 8. As such, the Court gave Long the opportunity to amend his complaint. Long filed an amended complaint on February 16, 2022. Although this case was previously assigned to Magistrate Judge Stephen C. Dries, because not all parties have had the opportunity to consent to magistrate judge jurisdiction, the case was randomly reassigned to a District Judge to screen the amended complaint.

### SCREENING OF THE AMENDED COMPLAINT

The Court has a duty to review any complaint in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity, and dismiss any complaint

or portion thereof if the prisoner has raised any claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b). In screening a complaint, the Court must determine whether the complaint complies with the Federal Rules of Civil Procedure and states at least plausible claims for which relief may be granted. To state a cognizable claim under the federal notice pleading system, a plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It must be at least sufficient to provide notice to each defendant of what he or she is accused of doing, as well as when and where the alleged actions or inactions occurred, and the nature and extent of any damage or injury the actions or inactions caused.

"The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 556. "[T]he complaint's allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (internal quotations omitted).

## ALLEGATIONS OF THE AMENDED COMPLAINT

Long explains that he was housed at the Winnebago County Jail from August 20, 2020, through March 10, 2021. He asserts that, in light of the COVID-19 pandemic, he was initially quarantined for fourteen days in a single cell, consistent with the protocol for all incoming inmates. On September 9, 2020, Long was moved to a dormitory-style pod, which housed sixty-eight men. Long asserts that, at that time, no inmates were infected with COVID-19. About two months later, an inmate on the pod became visibly sick (Long does not describe his symptoms), and a few days later he was removed from the pod and taken to the hospital. Dkt. No. 12 at 3-4.

According to Long, jail officials then brought in the Wisconsin National Guard to test the inmates and jail staff. Long asserts this was the first time any testing at the jail occurred. Long allegedly tested negative for COVID-19. About a week later, on November 19, 2020, another inmate in the pod developed a fever. The inmate was removed from the pod to a medical cell. According to Long, around that time, nearly all the inmates in his pod began to feel sick. On November 23, 2020, the Wisconsin National Guard again tested the inmates and jail staff. Long tested positive for COVID-19. Long asserts that he was very sick from about November 18 through December 2, 2020. Dkt. No. 12 at 4-5.

Long asserts that prior to the first inmate testing positive, jail officials had no "COVID-19 virus preventative measures and/or procedures and/or protocols in place to [test] the WCJ *deputies* and *other employees* for COVID-19 on a *weekly* basis." Dkt. No. 12 at 5 (emphasis in original). He explains, however, that after the first inmate tested positive, jail officials began testing jails staff on a weekly basis. Long asserts that "numerous" jail staff members tested positive for COVID-19 during October 2020 (Long does not explain how he knows this) but continued to report to work before they experienced symptoms or went to the hospital to be tested. According

to Long, from October through December 2020, more than a third of the jail staff tested positive for COVID-19. Long concludes that jail staff brought COVID-19 into the jail and infected the inmates. Dkt. No. 12 at 5-6.

Long further asserts that during the pandemic, jail officials required inmates to clean their pods, including the restrooms. He alleges that inmates were provided only with antibacterial cleaning products, not antiviral cleaning products. According to Long, he requested a solution of bleach and water for the inmates to use for cleaning, but his request was denied because bleach was not used in the jail. Long attempted to file grievances regarding the lack of cleaning supplies and exposure to COVID-19, but states that on several occasions he was denied grievance forms by some of the Defendants. Dkt. No. 12 at 6-9.

Long asserts that, on February 3, 2021, his extended supervision was officially revoked. According to Long, at the time, there were forty other inmates ahead of him on the transfer list to Dodge Correctional Institution due to a backlog caused by COVID-19. Long states that he was moved to the top of the transfer list based on his multiple requests for inmate grievance forms and his complaints about jail staff's handling of the COVID-19 pandemic. Dkt. No. 12 at 14-17.

## THE COURT'S ANALYSIS

Long first claims that Defendants violated his rights by not preventing his exposure to COVID-19. Long was detained at the jail while awaiting formal revocation of his extended supervision. The Fourteenth Amendment applies to conditions of confinement claims brought by pretrial detainees. Because Long's custody was predicated upon his prior conviction, the Court assumes the Eighth Amendment applies, but the law is not entirely clear on the question. The Court will therefore apply the less stringent Fourteenth Amendment, which requires the Court to evaluate whether the challenged conduct was objectively unreasonable. *See Mays v. Dart*, 974

F.3d 810, 819-20 (7th Cir. 2020). As the Seventh Circuit recently emphasized, "objective reasonableness turns on the facts and circumstances of each particular case." *Id.* at 819 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). Courts should take care not to "evaluate each aspect of the disputed actions in a vacuum" but to "consider the total of the circumstances surrounding the challenged action." *Id.* at 820.

The actions Long challenges occurred in the early days of the COVID-19 pandemic before vaccines were available. He explains that, when he first arrived at the jail, there were no positive cases. As a precaution against new inmates bringing COVID-19 into the jail, every new inmate was quarantined in a single cell for fourteen days before being housed in close contact with other inmates. Long explains that, shortly after the first inmate became infected, that inmate was separated from other inmates, and jail officials brought in the Wisconsin National Guard to test all inmates and jail staff. According to Long, weekly testing of jail staff continued thereafter, and inmates who became sick or tested positive were separated from inmates who tested negative. Inmates were also provided with cleaning supplies.

Given that courts must give correctional administrators "substantial discretion to devise reasonable solutions to the problems they face, particularly when safety and security interests are at stake," the Court cannot reasonably infer that Defendants' response to Long's risk of contracting COVID-19 was objectively unreasonable. *Mays*, 974 F.3d at 820 (quoting in part *Florence v. Bd. of Chosen Freeholders of Cty. Of Burlington*, 566 U.S. 318, 326 (2012)). Long points out that jail officials did not implement weekly testing until after inmates and jail staff started to show symptoms. But, in light of the other precautions that were taken, this decision does not lead to a conclusion that jail officials' overall response to the risk posed by COVID-19 was objectively unreasonable. Testing is expensive and disruptive, and allowing people unassociated with the jail

5

to interact with inmates could implicate safety and security concerns. It would therefore be inappropriate for the Court to second-guess jail officials' decision to put off testing until the need for testing was apparent.

Long also asserts that his requests for different cleaning supplies than those offered by the jail were repeatedly denied. But allowing toxic chemicals into the jail for use by inmates would implicate safety and security concerns in that a cleaning agent such as bleach could be used to self-harm or to harm others. Further, the Mayo Clinic has advised that, while the virus can be spread if a person touches a surface with the virus on it and then touches his mouth, nose, or eyes, the risk of contracting the virus in that manner is low and can be mitigated by washing one's hands. *See* https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/novel-coronavirus/faq-20478727. Given these security concerns and the low risk of transmission from surfaces, the Court cannot reasonably infer that jail officials' refusal to concede to Long's demands for different cleaning products was objectively unreasonable. Accordingly, Long fails to state a claim on this basis.

Long also claims that Defendants violated his Fourteenth Amendment due process rights when he was prevented from accessing the jail's inmate grievance system. A plaintiff has no constitutional right to access the grievance process. *See Grieveson v. Anderson*, 538 F.3d 763, 770 (7th Cir. 2008). Where prison officials refuse or fail to provide grievance forms to the point where the administrative process is rendered unavailable, "the only consequence is that [a plaintiff] is relieved the duty to exhaust" his administrative remedies. *Delgado v. Godinez*, 683 Fed. App'x 528, 530 (7th Cir. 2017). Accordingly, Long also fails to state a claim on this basis.

Next, Long claims that his First Amendment rights were violated when he was moved to the top of the transfer list in retaliation for filing grievances. To state a retaliation claim, a plaintiff must allege that "(1) [the plaintiff] engaged in an activity protected by the First Amendment; (2)

he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014).

Long fails to state a retaliation claim because he does not allege that he suffered a deprivation likely to deter him from engaging in protected activity. Long explains that after his supervised release was revoked, he was moved to the top of the transfer list and immediately transferred from the jail to a state prison. But the Seventh Circuit has explained that there is no "blanket rule that *any* transfer motivated by the plaintiff's First Amendment activity is sufficiently adverse to constitute retaliation." *Holleman v. Zatecky*, 951 F.3d 873, 881 (7th Cir. 2020). By way of example, the appellate court noted that a "transfer that objectively improves the prisoner's condition . . . would not deter a person of ordinary firmness from engaging in protected activity." *Id.* Long has not offered any allegations regarding the conditions at Dodge compared to those at the jail. His amended complaint is clear, however, that he was not satisfied with the conditions at the jail. In any event, as Long concedes, because his supervised release was revoked, his transfer from the jail to Dodge was a certainty. The mere timing of when that transfer occurred does not by itself make the transfer adverse. *See id*. at 882 ("the disruption inherent in a transfer to a different facility does not by itself make the transfer adverse").

Finally, Long purports to assert state law claims, but because the Court has concluded that he has no federal claims, the Court will relinquish supplemental jurisdiction over the state law claim. *See* 28 U.S.C. §1367(c)(3); *Lavite v. Dunstan*, 932 F.3d 1020, 1034 (7th Cir. 2019). If Long wants to pursue those claims, he may do so in state court.

**IT IS THEREFORE ORDERED** that Long's federal claims are **DISMISSED with prejudice** for failure to state a claim and his state law claims are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that Long's motion to certify a class and appoint counsel (Dkt. No. 13) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Green Bay, Wisconsin this  7th   day of April, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

This order and the judgment to follow are final.  Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment.  *See* Fed. R. App. P. 3, 4.  This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).  If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome.  If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court.  *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious.  *See* 28 U.S.C. §1915(g).  If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury.  *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b).  Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment.  Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment.  The Court cannot extend these deadlines.  *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.